In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1448

BOJAN ANDRIC,

*Petitioner*,

*v.*

TODD W. BLANCHE, Acting Attorney
General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
No. A201-634-322

SUBMITTED DECEMBER 8, 2025 — DECIDED JULY 1, 2026

Before ROVNER, JACKSON-AKIWUMI, and MALDONADO, *Circuit Judges*.

ROVNER, *Circuit Judge*. Bojan Andric, a professional soccer player from Serbia, entered the United States on a visitor visa and then applied for asylum, claiming that he faced past persecution based on his membership in a social group consisting of "Serbian soccer players who are the victim[s] of violence [from] soccer hooligans who were unsatisfied with their

play."[1] R. 6-2 at 72. He also alleged persecution based on an imputed political opinion—namely, that the hooligans believed he was "anti-hooligan" and assumed, albeit incorrectly, that he had reported them to the police.

At his asylum hearing before an immigration judge, Andric testified that after a tie game with a rival team, three members of a soccer fan group called The Red Devils followed him home, accused him of poor play, threatened to chase him out of town, and beat him until he was unconscious. He awoke in a hospital where, for approximately two days, he was treated for moderate facial burns, a skull hematoma, and a mild concussion, and then discharged with instructions for home care. After the attack, he asked his club to release him from his contract so that he could play in a different city, but the club instead transferred him to a different team in the same city. In the fourteen months following the attack, Andric received three phone calls in which the callers identified themselves as Red Devils, told him that they knew where he was, and threatened continued harassment because of his poor performance on the field. After a practice one day, he noticed three Red Devils stalking him but escaped by getting into his trainer's car. The trainer knew a police officer who advised Andric to report further harassment to the police, but Andric testified he did not do so because he feared the hooli-

---

[1] The Merriam Webster dictionary defines the word "hooligan" as "a usually young man who engages in rowdy or violent behavior especially as part of a group or gang." "*Hooligan*." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/hooligan. (Accessed Jun. 15, 2026.) The term "hooligan" appears to be used often in Serbia to refer to gangs connected to rowdy soccer fans. *See, e.g.*, R. 6-2 at 164, 168, 175, 191.

gans were connected to law enforcement. He also testified that he believed internal relocation would not protect him because these soccer hooligans had nationwide networks.

The immigration judge found Andric credible but concluded that the harm he suffered did not rise to the level of past persecution, as it involved only a single beating that left no lasting impairments or limitations on his daily life. The judge surmised that the three threatening phone calls were intended merely to intimidate Andric. The judge further concluded that even if the beating and threats did amount to past persecution, the hooligans did not target Andric on the basis of a protected ground—either membership in a particular social group or imputed political opinion. Being a soccer player, the immigration judge determined, was not an immutable characteristic because it is not so intrinsic or fundamental to identity that it would be unreasonable to require Andric to change occupations to avoid harm. The judge concluded that the articulated social group of "Serbian soccer players who are victims of violence from soccer hooligans" lacked particularity because membership would fluctuate with game outcomes. Nor, the judge found, did Andric provide any evidence that the hooligans imputed an anti-gang political opinion to him or believed he had reported them to the police. Rather, the hooligans were dissatisfied with Andric's performance and his high pay—indicating personal targeting or retaliation. And the immigration judge also found that because it would be impossible to predict which professional soccer player in Serbia hooligans would target at any given time, the group lacked specificity.

The immigration judge then concluded that, even if Andric could show some connections between the hooligans and

the police, he had not provided credible evidence that the police consistently ignore attacks by soccer hooligans or would be unwilling or unable to protect him. And because Andric lived in Serbia for fourteen months after the beating without further physical harm, the immigration judge found he could not demonstrate an objectively reasonable, well-founded fear of future persecution.[2]

On appeal to the Board of Immigration Appeals, Andric revised his proposed protected social group to "former soccer players in Serbia," but the Board deemed that argument waived. It agreed with the remainder of the immigration judge's conclusions and noted Andric's waiver of his arguments about the Serbian government's inability or unwillingness to protect him and his inability to safely relocate within Serbia.

We review the immigration judge's reasoning along with the Board's analysis adopting, affirming, and expanding that decision. *Mohammed v. Blanche*, 174 F.4th 1037, 1043 (7th Cir. 2026). Recently, in a unanimous opinion, the Supreme Court clarified that we must review "the entirety of the agency's conclusions—both the underlying factual findings and the application of the [Immigration and Nationality Act] to those findings—for substantial evidence." *Urias-Orellana v. Bondi*, 146 S. Ct. 845, 851 (2026).[3] In other words, we will treat as con-

---

[2] Having made these findings, the immigration judge found that Andric could not meet the more demanding standards for withholding of removal and protection under the Convention Against Torture—holdings that Andric does not appeal.

[3] "Agency" refers to the immigration courts and Board of Immigration Appeals together.

clusive "the agency's determination whether a given set of undisputed facts rises to the level of persecution under § 1101(a)(42)(A) … 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting § 1252(b)(4)(B)).

### A.

As an applicant for asylum, Andric bears the burden of demonstrating that he is a refugee—that is, someone who is unwilling or unable to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In this case, Andric claims that he was persecuted on the basis of his membership in a social group—either as initially asserted, "Serbian soccer players who are victims of violence from soccer hooligans who were unsatisfied with their play," or, as he iterated on appeal, "former soccer players." (More on the evolving description later.) He must demonstrate that the harm he suffered was connected to, or on account of, his membership in that social group or another protected basis. *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992). In other words, a protected ground must be "at least one central reason" for the persecution. *Martinez-Martinez v. Bondi*, 147 F.4th 831, 836 (7th Cir. 2025) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). If he meets the burden of establishing that he suffered past persecution, he is entitled to a rebuttable presumption that he has a well-founded fear of future persecution if returned to his place of origin. *See Lozano-Zuniga v. Lynch*, 832 F.3d 822, 827 (7th Cir. 2016).

We need not begin with an evaluation of past persecution, however, because none of the harm Andric suffered was be-

cause of a statutorily protected ground. As we noted, Andric claims persecution based on membership in the social group of "Serbian soccer players who are victims of violence from soccer hooligans." A cognizable social group is defined by characteristics that are either immutable or so fundamental that a person ought not be required to change them. *Cece v. Holder*, 733 F.3d 662, 669 (7th Cir. 2013) (en banc). We have previously held that whether a proposed social group is cognizable is a question of law we review de novo. *Id.* at 668–69. The Supreme Court's latest directive on how we review decisions of the agency does not address this question, but we have no reason to think the standard has changed after *Urias-Orellana*. In any event, Andric's proposed social group fails under either substantial-evidence or de novo review. *Cf. Borja-Pacheco v. Blanche*, No. 23–8052, 2026 WL 1145957, at *1 (2d Cir. Apr. 28, 2026).

An immutable characteristic need not be innate like race or sex, but it must be something "so fundamental to individual identity or conscience that a person ought not be required to change." *Cece*, 733 F.3d at 669. On appeal, Andric concedes that being a professional soccer player is not an immutable characteristic because a person can stop playing professionally. In his brief he states that "[i]t is difficult to see why professional soccer playing is fundamental to players' identities or consciences—it is just a job." Andric Brief 39.[4] He now

---

[4] Because Andric himself concedes this point, we have no reason to decide to what extent a person must be forced to relinquish a career and profession to avoid persecution. It might be true for many people that their occupations are not such fundamental parts of their being that it would be unreasonable to expect them to change their occupation to avoid persecution. For others, however, a career may be fundamental to their

(continued)

claims that the proper social group is "*former* soccer players in Serbia"—a claim he raised before the Board but not before the immigration judge.

The Board found that Andric had waived this issue because he had not defined the relevant social group as "former soccer players" before the immigration judge. Andric argues that his second definition—"former soccer players"—is similar enough to the first that we should not find waiver. He characterizes the shift from present to past tense as a "distinction without a difference." Andric Brief 41. Yet he also contends that the new definition is different enough that it should succeed where the other has failed. In other words, he is simultaneously asking us to deem the change insignificant enough to prevent waiver, but significant enough to warrant a different outcome on the merits. The Board properly found waiver. We cannot consider a new social group raised for the

---

personhood because of, among other things, something that makes the work integral to their identity, the number of years of training, the non-transferability of the skills, or because of the artistic, political, or religious nature of the job. *See Cece*, 733 F.3d at 669–70; *see also Plancarte Sauceda v. Garland*, 23 F.4th 824, 834 (9th Cir. 2022) (finding that although nursing is technically a current occupation, a licensed nurse in Mexico was a member of a particular social group with an immutable characteristic, because even if she stopped working as a nurse, she would still retain the knowledge and skills that made her valuable to those targeting her). *But see, e.g., Miguel-Pena v. Garland*, 94 F.4th 1145, 1161 (10th Cir.), *cert. denied*, 145 S. Ct. 545 (2024) ("'[T]he internationally accepted concept of a refugee simply does not guarantee an individual a right to work in the job of his choice,' meaning that an asylum applicant may be required to change jobs to avoid future persecution.") (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 234 (BIA 1985)).

first time before the Board. *See Duarte-Salagosa v. Holder*, 775 F.3d 841, 845 (7th Cir. 2014).

It is important to the understanding of the definition of social group, however, to note why both groups fail. Any harm Andric fears in either case stems from personal and performance-related grievances, not from membership in a cognizable group. After all, he does not claim that if he returned to professional soccer, and consistently led his team to victory each game, he would still face harm from the hooligans.

Andric's revised social group definition exposes flaws in both definitions. Current soccer players who are harassed for poor individual performance do not belong to a social group with immutable characteristics. Former soccer players, by definition, are no longer engaged in any activity that would expose them to angry fans. Andric offers no evidence that former soccer players face continuing persecution by soccer hooligans. Nearly ten years have passed since the tie game after which hooligans beat Andric for his poor performance. Although Andric says that he would like to return to professional play, he is now in his thirties and has not played professionally in almost a decade. And if he did return, any threats or violence would not be on account of his membership in a cognizable social group; it would be due to personal characteristics—his on-field performance—or because of his current profession, which he concedes is not a viable social group under the statute. And if he does not return, and is merely a "former soccer player," he has not provided any evidence that the hooligans would hold a decade-long grudge into his retirement.

To sum up, at the time of the past harm, he was not beaten because he belonged to a social group (current soccer players), but because of individual, transient factors—the hooli-

gans' dissatisfaction with how he played in one or more games. That would remain true if he returned to playing. A personal dispute cannot support an asylum claim. *See Mustafa v. Holder*, 707 F.3d 743, 752 (7th Cir. 2013). And if he retires, he might belong to a social group of former soccer players, but there is no evidence he would be targeted on account of that status.

Although Andric's claim during his initial interview and before the immigration judge focused primarily on imputed political opinion, the argument section of his brief before this court does not discuss persecution based on political opinion or imputed political opinion at all; instead, it focuses on so-cial-group claims. That issue, therefore, has been waived. The fact section of his brief does indeed discuss how some re-searchers have studied a direct link between sports and violent nationalistic extremism. He argues that when sports teams lose, the loss hurts hooligans' self-esteem, which is a form of nationalism and thus a political opinion. But if this is true, this explains only the political opinions of the hooligans, and not what political opinion they imputed to Andric. "The ordinary meaning of the phrase 'persecution on account of … political opinion' in § 101(a)(42) is persecution on account of the victim's political opinion, not the persecutor's." *Elias-Zac-arias*, 502 U.S. at 482.

In any event, his argument before the immigration judge about political opinion was amorphous—suggesting that the hooligans thought Andric was "anti-hooligan," or that he had reported them to the police. He offered no solid evidence, however, that the hooligans imputed such an opinion to him, or even that such a stance qualifies as a political belief. *See Elias-Zacarias*, 502 U.S. at 482–83 (determining that mere re-

fusal to join a gang did not qualify as the expression of a political opinion without further evidence showing that such refusal was politically based). "[S]ince the statute makes motive critical, he must provide *some* evidence of it, direct or circumstantial," that is, that the hooligans were aware of his political opinion and were motivated to harm him because of it. *Id.* at 483 (emphasis in original). The immigration judge was more than justified in concluding that Andric provided no evidence of motive beyond the hooligans' dislike of his performance.

Having found no compelling reason to overturn the agency's determinations regarding the lack of nexus to a protected ground, we need not address whether Andric waived his arguments regarding the government's inability or unwillingness to protect him, or his ability to safely relocate within Serbia.

**B.**

This leaves one final point of discussion. Andric's counsel argues that the immigration judge's decision-making method denied him a reasoned decision. In recent years, immigration judges have been appending a boilerplate "Addendum of Law" to their decisions and incorporating it by reference. Often, as in this case here, the individual decision itself contains little, if any, citation to caselaw. This format complicates meaningful review by requiring the Board or this court to connect the decision's factual and legal conclusions to authorities cited in the separate addendum, and to guess which authorities support which conclusions in the decision. Certainly, we would not accept a brief that set forth the facts and legal conclusions in one document and then invited us to dig through a boilerplate addendum for the supporting law.

Our circuit has long required that agency orders exhibit reasoned decision-making that builds a "rational bridge between the record and the agency's legal conclusion." *See, e.g.*, *Mengistu v. Ashcroft*, 355 F.3d 1044, 1047 (7th Cir. 2004). It is difficult to discern whether that bridge has been built when the record and legal conclusions appear in one document and the legal authorities in another.

We recognize the significant caseload pressures under which the immigration courts operate. The agency and its immigration judges have long struggled to keep up with the deluge of cases before them. *See generally*, Aadhithi Padmanabhan, *Abandoning Deportation Adjudication*, 77 Stan. L. Rev. 1557, 1572–83 (2025). But as we have noted, "egregious failures of the Immigration Court and the Board to exercise care commensurate with the stakes in an asylum case can be understood, but not excused, as consequences of a crushing workload that the executive and legislative branches of the federal government have refused to alleviate." *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007). Immigrants seek asylum because of alleged persecution in their countries of origin; their safety—and in some cases, their lives—are at risk. These are serious matters warranting serious consideration and full due process.

Nevertheless, as far as we can tell, no court of appeals has rejected the practice, and we are not inclined to do so in this case, where the outcome is clear. In this case, we are certain that building that more explicit bridge would not have altered the outcome of Andric's asylum claim. We therefore can DENY his petition for review without further consideration of these procedural matters.